The last case this morning is 412-1056, Community Living Options, Inc., NDBA, Bellefontaine Place v. Department of Public Health. For the appellant is Jason Lundy. Are you ready, sir? Yes, sir. And for the appellee is Sharon Purcell. Mr. Lundy, you may proceed. Thank you very much. May it please the Court? Counsel. Counsel. I'm Jason Lundy, representing Community Living Options through the businesses of Bellefontaine Place, which is a 16-bed ICFDD facility. It's a group home for adults with developmental disabilities. As a result of a licensure inspection by the Illinois Department of Public Health on January 8, 2009, the department cited Bellefontaine Place with two violations and imposed $20,000 in fine and a conditional license. We appealed under the administrative review law and we asked the court to reverse the IDPH's decision that the facility committed violations. I'd like to address two procedural issues first and then reserve most of my time for the issues on the merits of the violations. But first, after the administrative hearing, the ALJ authored a report and recommendation that went to the assistant director of IDPH. The assistant director then issued a decision and a final order, which was different than the ALJ's recommendations. He rejected his findings of fact, made different conclusions of law, came to the opposite determination, finding that Bellefontaine Place had in fact committed violations. On administrative review in circuit court, the record didn't contain any evidence of the deliberation or work by the assistant director in going from the ALJ's recommendation to her final order. I suspected that the assistant director did have some communications with others in preparing that, therefore made a motion to supplement the record. What do you mean by that? Well, Judge... Who is it you think she spoke to and what was the impropriety in her doing so? I think she spoke to another ALJ of the department and possibly other people within the department on the legal staff. Frankly, we have no way of knowing that, but there's... Let's assume she did. What's the impropriety in doing it? Well, Judge, the question... One, we can't judge the impropriety of it because we don't know what information was shared. Perhaps they talked about a grudge against this facility, the fact that they must find a violation because a death occurred. Perhaps they found parts of their decision had nothing to do with the evidence or the law. We certainly should have a chance to know that so we'll... And the court can make an informed decision on whether the final order was appropriate. Well, here's my concern. The ALJ essentially does the initial investigation, makes a report, suggests them to the department. This is fairly standard practice. We see more than I would like all this administrative review stuff. What are the limitations pertaining to what the director of the department or designated person is going to be coming up with the department's decision? What are the limitations in what they may do? That is, to explain it, the decision has to be based upon the record, whether it's contrary to manifest weight. But short of that, what limitations are there on what they do and who they speak with? Well, Judge, in both the Illinois Administrative Procedure Act and the IDPH rules, there's explanation of ex parte communication, some that is permissible and some that is not permissible. It's permissible for an ALJ to have the assistance of a personal assistant. It also talks about the members of the department may communicate with each other. It doesn't say exactly where those lines are drawn, but for this case, whether the ex parte communication was permissible or not is really besides the point, because the APA and the IDPH rules say that any ex parte communication must be made part of the record. So even permissible ex parte communication must be reduced in writing, if it's oral, or if it's written, be provided as part of the record. So a director of a department or an assistant director, if that director consults with legal counsel for the department in reviewing the ALJ's decision, and legal counsel assists in writing whatever the director writes, is that an ex parte communication? Absolutely, Your Honor. So that would have to be disclosed? Absolutely. That's communication with a party to the litigation. Legal counsel for the IDPH were the people prosecuting this case. And for an ALJ to talk to... I didn't ask if the ALJ talked to them, the director. It still is ex parte communication. So the director, the non-law trained director, would be prevented from consulting with legal counsel for his or her department in drafting a decision or asking a legal question, unless it was disclosed, because that would be ex parte. If that were to be permissible, it would still have to be entered in as part of the record in the case, because whether it's permissible or impermissible, it must be made part of the record. I do think that that would be impermissible ex parte communication, because it's with a party, the department itself. And we do get into some difficulty here with the department being both the enforcing agency, the prosecutor, and the adjudicator. But I don't think that... Well, that's the case with every administrative review, isn't it? It is, and that's why I think the APA has in their very explicit requirements that any sort of that ex parte communication must be made part of the record and disclosed to all parties involved. And the second procedural issue is a jurisdictional one. Just before you leave that, you filed a motion to supplement the record, but supplement the record with unknown materials that may not even exist? I don't quite understand that. Well, Your Honor, in the circuit court, the department in briefs did concede that the assistant director did have ex parte communications, and they argued that it's permissible. I have absolutely no idea what that communication was. Did the circuit court judge? And neither does the appellate court. But we should. And the circuit court even had the opportunity to do an in-camera inspection of the document to conclude whether it was something that really did need to be part of the record. But it's a very, I think, bright-line test that if there's any ex parte communication by the ALJ or the director, then it must be made part of the record. It's according to Section 10-60C of the APA and of the IDPH Rules, Section 100.19A1. Touching just momentarily on the jurisdictional issue, that has been litigated recently by this court and the first district about the mandatory timeframe in Section 3-212C of the Nursing Home Care Act. The department has no later than 60 days to issue its determination of a violation after the survey was concluded. This case frames the issue about whether that determination was made within the relative time or outside the time period. And the question really comes down to what is the determination? The department decided and still argues that a survey processing log made by a supervisor decided that there was a violation in place. And that was done within the 60-day time period. However, outside that 60-day time period, the supervisor amended the survey processing log, made a new form of legal action taken, settled and made the conclusion that the violation was actually two violations of the Code Section cited here. And based on that determination on April 2, 2009, IDPH issued the Notice of Violations to Belafonte. When do you say the 60 days began? It begins at the exit time of the survey. So the conclusion of the survey, in this case it was January 8, 2009. And the issue about the determination, I think the question for the court is the legal requirement of determination under Section 3-212. Is that IDPH forming the idea that there's a violation? Or is it IDPH making the decision that there's a violation, including what the violations are and how many of them there are? We submit that determination is not ultimately made until it's finalized by the department in the nature and quantity of the violations. That wasn't done here within the 60-day time frame, so the department lost the jurisdiction for the case. Going to the allegations of the survey, what we had here, Your Honors, was a van accident. Staff of Belafonte was driving three residents in a facility van to some of their appointments, dropping one resident off and then continuing on to take two other residents to the audiologist. During that van trip, a truck in front of the van breaks suddenly. The van driver had to, in turn, break quickly. And resident R1, who was sitting in the back seat, fell forward and hit her face on the dashboard and sustained injuries and later died from those injuries. IDPH claims that Belafonte committed negligence, was neglected R1. And the basis of that determination was the conclusion that Belafonte did not adequately seat belt in R1 in the back seat, didn't check the seat belts and verify the seat belts. First Judge, that's legally erroneous because it presupposes a requirement for seat belts in the first place. And in fact, none existed at the time of the survey. In the Nursing Home Care Act, in the statute, the enabling statute, there's absolutely nothing that talks about or requires seat belt use or vehicle transport. In the code, the regulations for ICFDD facilities, there's absolutely nothing that talks about seat belt use or vehicle transportation. IDPH failed to identify a statute or regulation that mandated seat belt use or its protocol. At the administrative hearing, they haven't done so anyway. That seems to be a particularly restrictive use of the term. If the statute regs talks about how nursing homes look out for the safety of the residents while transporting them or treating them or whatever else, why wouldn't that incorporate a requirement? By the way, when you put these folks in vans or cars to drive them around for hospital visits or doctor visits or whatever, make sure they're buckled into their vehicle safely. Well, Your Honor, if IDPH had a regulation stating that, we wouldn't be able to contest the… Why is it unreasonable for us to, for IDPH to say, this is sufficiently within the broad range of the regulations to provide safety for the residents without having to say, make sure they're buckled into their seat belts. Why is that unreasonable? Because, Judge, then that sets up a situation where IDPH on an ad hoc basis retrospectively comes back after any incident or accident and says, we didn't follow a policy or you neglected the residents because something bad happened. Well, you know, maybe it would be better, and I suspect it would be in retrospect for IDPH, to specify, by the way, you're going to be driving these people around, make sure they're buckled safely into the car and have their seat belts on. On the other hand, why should you have to be told that? Why isn't that something that the people would know and why isn't it… You know, when you give IPI instructions, one of the very first, I think it's 101 in both civil and criminal ways, you may consider the evidence in accordance with your common experiences in life. One of the common experiences in life, I think that we've had, certainly I've had, is going to amusement parks where there are rides for kids and, indeed, for adults, and how just before the ride takes off, the staff walks around and makes sure and literally handles all the attachments, the seat belts and everything else on the roller coasters and the other rides that you have to make sure that they're fastened and functioning. You know, I've seen that in several different places and it occurs to me that that… and for parents, you know, if you have kids in your car, whatever it is, it seems to me that this is so now routine and so expected that I shouldn't have to or the nursing home shouldn't have to be told, by the way, transporting these elderly people who have really seriously diminished IQs, you can't expect them to do it. You make sure that they're buckled in. Your driver or member handles it and checks it. Well, Judge, let me address a lot of those things. There's evidence in the case, but backing up with your amusement park example, I can't say this for certain, but given how highly regulated everything is in the state, it would not surprise me that there's a specific regulation requiring seat belt or harness checks in amusements. That's a regulated industry as well. Is it safer to be buckled in in a middle or back seat of a van as compared to not be buckled in? Are there studies on both sides of that issue? Judge, I can tell you Illinois law at the time did not require seat belts in the back seat. The Illinois Vehicle Code required front seat passengers to have seat belts only. It's since been amended and now seat belts are required in front and back seat. I think that was as recently as this last year. But, again, this is a question of what's best practices. Well, IDPH as a government agency can't have the ability to second guess a facility's operations retrospectively and say, after an accident happened, we think you should have had a different best practice in place. Now, we had never opined on that before, and none of the other ICFDD facilities in the state have been made aware of an obligation for staff to physically seat belt in. But because an accident happened on December 3, 2008, we're deciding that Belfonte in place violated the regulations. We can talk about what's reasonable and what may be the standard of care in a tort context, but that's different than a government agency implementing a limited amount of licensure oversight over a business. If it's not in the Nursing Home Care Act and it's not in the regs, IDPH can't hold Belfonte in place to a higher standard than the Vehicle Code and a standard that is only applied to that facility after the accident. Your Honor, let me talk about the issue about the amusement park in and checking everybody. Let's go to the evidence in this case. The evidence in this case about the van ride was DSP Lockett, who was the driver, heard the residents click their seat belts before they left the facility and said, everybody ready to go? You buckled in? Yes. After the first stop, she got back in the van, looked behind her, saw the seat belt on R1. After the accident, when a paramedic arrived, R1 told the paramedic, I had my seat belt on. R2's peer, her seatmate, her friend, corroborated that R1 had a seat belt on. R1 had been at Belfonte in place for 20 years at this time. Counsel, seriously, if she had her seat belt on, how did she end up flying into damage? We have no idea, Judge. You have no idea? She didn't have it on. I mean, so Judge, what that is, is saying that because an accident happened, there was neglect by the facility. What meaning should we ascribe to the verbalization of a 79-year-old profoundly retarded individual with dementia, who may have, I don't know physically what her situation was in terms of frailty, but forgetting the frailty, what evidentiary weight is to be ascribed to her saying something after she suffered what appears to be a brain injury that caused her death, that I had my seat belt buckled. Understanding this isn't part of the record, but I would question the ability of that individual to verbalize that concept, or possibly to even understand what a seat belt is for. Your Honor, I see my time's up. No, no, it isn't. That's a red light. Sorry, sorry. Go ahead. Bar 1 was 79 years old. She had moderate mental retardation. Well, moderate today. Her whole laundry. Years ago, that would have been profound. A 50-year, 50 IQ. But I don't understand. His point, though, if she had the seat belt on, she couldn't have flown into the front belt. She couldn't have failed. She could have taken it off. I thought they tested it after the accident. They said it was functioning properly. So, absolutely, Judge. So we're just guessing. But it's not up to Belafonte in place. Well, to me, it's not much of a guess as to whether she had the seat belt on. It could have been buckled. That doesn't necessarily defeat your argument. It was only a lap belt. She may have fell forward with it, and it disabled her. But, Judge, it is the Department's burden of proof to show negligence. And all the evidence in the record indicated the seat belt was on. We can speculate or draw inferences that it wasn't, but that's not evidence to prove neglect. Okay. You'll have a chance to address this again in rebuttal. Thank you. Mr. Purcell? Well, I would imagine it's fairly common that nursing homes and shelter care facilities provide transport for residents or patients. I would imagine that's true. Why isn't there a regulation about – I mean, if the home is to be held to a higher standard of care than the vehicle code, why isn't that addressed? I mean, it's a common thing to have. Transport is provided. Yes, Your Honor. I would venture that there's fine lines in regulating, so it's common sense. And this is something that a facility may choose. It's a service that it chooses to provide. So at that point, then, the regulations – there has to be a standard of care for that. But it seems to me if there's a fine line in regulating, there should be a fine line in penalizing if there are no specific sections of the code that addresses the seatbelts, nor does the statute. But the statute – what you have to look at is what the purpose of this statute is. And the purpose of this statute is the safety and the protection of these residents who are very vulnerable, dependent on others to provide care. And there's a certain standard of care and a duty that attaches when these facilities are licensed to provide this care. The fact that there's no – so when they do decide to provide a certain service, under the Act and under the regulations, there has to be a strategy in place to minimize risk for that particular service. If you decide to provide a service – All the more reason why you should provide regulations. That may be true, but that does not mean that the finding here that there has to – that absent of regulation, there is no duty. Well, it's almost like the department's saying, yeah, we were negligent in not regulating, but we're going to find that the nursing home was actually the negligent part here. It's okay for us not to draft the regulations, but by golly, they should have thought about it. I mean, there's a fairness in that. It seems heavy-handed to me. The idea that every single – every circumstance and everything is going to have a particular rule and a regulation where there are, you know, standards of care and neglect, which has – But the same argument can be made on behalf of the nursing home. I guess it's just hard for me to conceptualize how they can be faulted when the department hasn't drafted any regulations and what – when you're basically arguing clearly they should have had a policy. Well, then clearly you should have had a regulation. That's the way it seems to me. There needs to be – they provide the service. There needs to be a method, a practice at that point, as I said, to manage – you know, minimize the risk to these particular individuals who are so dependent on, you know, these licensed facilities and their caregivers who have that – you know, they have that duty and they have that – they should know what those standards of care are. And as you were expressing earlier, these are very – you have somebody who's very – you know, their capabilities are not – they're grown-ups, but they're not adults. It's a six-year-old, six-and-a-half-year-old. And then in this case, you also have somebody who – you have an elderly person and all those frailties so that when – you know, so what is that – when you provide the service, what is going to minimize that risk? I mean, common sense tells you, even absent, you know, specific rules, that you need to have some way of – and the employee should know what that method is of, you know, minimizing that risk so you don't have – Well, common sense should have told the department the same thing. But in the meantime, there is – it really undermines the purpose of the act to protect residents who are so vulnerable, who are so dependent, and don't understand. I mean, would somebody who doesn't really understand necessarily why I'm being told to do these things, or on my own I know to do these things, to – harsh penalties on this particular facility when the department itself didn't even specify that people needed to be buckled in in these circumstances? And it was supposed to be obvious to the facility, but why wouldn't it be just as obvious to the department? That's my problem. I understand that, but – Because it seems like to me all the arguments you're making against the facility could be made against the department itself. But the department is there to regulate it. It doesn't run all of the facilities. It protects – I mean, it effectuates the act, you know, to do that. But that's where these lines and regulations come in. Let me ask you this question, following up on Justice Stern's question. Shouldn't the absence of a particular regulation saying, make sure these people are buckled in and checked affirmatively each time, so as to hopefully avoid what would happen in this case, shouldn't the absence of that mitigate the penalty that Bellefontaine suffers here? In other words, it seems to me this is a different case had there been a specific regulation in place before this accident saying, by the way, whenever you're transporting any of these people, we expect your staff to make sure they're buckled in and to check the buckle each time, the seatbelt, make sure that that's properly – they're buckled in. And they didn't do it. That'd be one thing. But in the absence of a specific requirement, and now we're talking about the general overall protection and take care of people and don't be negligent, if they don't do it, that would be different. And it seems to me like the department is punishing them with this, what is it, conditional – what was that, sanction? It's a conditional – it's sort of a conditional. Yeah, I mean, that's putting their license to stay in business in jeopardy and also a $20,000 fine seems pretty harsh. Why should we approve your taking that action, this harshness, when the violation at issue is based on a essentially ambiguous – what's that phrase? Emanations from a penumbra of the overall regulations governing treatment of patients. Well, first of all, I don't think that – I mean, I don't think that it is such a harsh penalty in light of the violation. Now, the idea that – I mean, here there was not – the best insurance, the best insurance that the driver in this van, that Bellefontaine had, that its residents were being secured in the van while they were being driven around, was our two who had severe deficiencies who said, oh, I'm doing it for her. Look, there's no way – that's the best insurance, or listening to clips. So, I mean, it's – and given – and this is not just a negligence, there's a definition of neglect. Neglect, as I said, it requires adequate supervision and oversight, appropriate to meet the needs of these particular residents. And the definitions in the regulations themselves provide that it's to meet the needs of the residents under a particular set of circumstances in existence. So, the idea – They should have done it. Why is the fine penalty so great? The violation is great. It's not just a – The general emanations about be careful and take care of these people and don't be neglectful. Well, okay. No, the code provides – the code, the whole purpose, and I know, you know, I'm talking about the purpose, but it is the purpose of the act. And facilities, when they are licensed, are to comply with that to protect the safety and the welfare and the health of the residents. Well, I guess what makes me look at this with a slightly jaundiced eye is that the administrative law judge on a very lengthy decision seemed to give the case full attention and change the original findings from the survey. And I guess it was some sort of penalty that was imposed. It was hard for me to discern from the record. But certainly, it was much, much less than what the department ultimately did. Anyway, the decision is made by the administrative law judge. It goes to the director. And lo and behold, it looks like the department says, Oh, crap. We should have had a regulation on this. And so you put the hammer down on this particular facility. No, I don't agree with that. I don't know if that's whatever, but one can't help but speculate about that when you look at this record. No, the record – everything in the – it's just simply – the AOJ makes the – you know, it's that recommended decision. The final decision is always – and that's what – the final decision is the assistant director's decision. And unless that one is clearly erroneous or against the manifest weight of the evidence, if there's no evidence in the record to support the assistant director's findings of fact, or nobody could come to this conclusion, then it should be affirmed. We shouldn't be here re-weighing the evidence and credibility. That's – that's not – Well, what's the purpose of having a hearing in front of the AOJ anyway? The AOJ – that's the fact-finding hearing. You're going to have a hearing, an adjudication. And then the department rejects the facts as found? No, no. The department made its – the assistant director made findings based on the record, which the assistant director is authorized and has a duty to perform. They review these decisions, and it's not just simply, well, the AOJ decided this, and so I must do the same thing. And if you look – if you inspect the AOJ, the assistant director's findings and conclusions, they correlate with – I mean, I'm looking at the record. Here's what I see, but based on, you know, the department's expertise and its policies and its purposes, which maybe the AOJ, you know, it's a much more – it's a small – you know, they're not necessarily looking at all the same factors that the director is going to be looking at, or the assistant director. So the AOJ has no expertise in the area? Oh, no, I'm not saying that at all. I'm sure their AOJs do. And, you know, I mean, it's – Well, let's segue into counsel's argument, because I think it flows from this. Why not supplement the record and find out exactly what happened after the director got the AOJ's recommendation to make additional factual findings and different conclusions of law? Why wouldn't that make sense? It doesn't make sense because the AOJ's – the director's decision is based, as the circuit court concluded, on the record – on the evidence in the record. So the idea, then, that you're going to be looking around for – I don't – there's just no basis for doing that as a basis for the AOJ's – the assistant director's decision. Well, I wouldn't expect to find any evidence of a grudge. Why not supplement the record? Tell them what happened with the case once the director got involved in it. What's the – you know, what's the idea of not being transparent about that? There should be nothing to hide. The – both the Administrative Procedure Act and the department's regulations allow for the director, the assistant director, to have the assistance and to talk with other people within the agency. I have no problem with that. I just don't understand why not full disclosure and say, yeah, we talked to so-and-so, we talked to this attorney. I mean, why not just provide that information just to satisfy the facility? To that purpose? How would that be relevant to review of a decision that is entirely based on – Well, I don't know. We don't know what's out there. How do I know if it's – There's nothing in the – there's nothing in the decision that is not based on the record. And that's the review here. Whether or not somebody – you know, who knows? Who knows what – but to say that, well, we think maybe they don't like us, and now we want all of your product when you're talking to your other people, even though the Administrative Procedure Act and the code – I don't know why that wouldn't always be true for every agency. Well, do you know why they might speculate why the department may not like them? The – there's no evidence of that, Your Honor. Well, put yourself in the place of the facility. They get the decision, it goes to the director, and then it's just like it's stood on its head. I don't agree that it's stood on its head. The decision is based on what was in the record. The director, the assistant director reviewed the record. The director then in the ALJ just saw the record very much differently. But that's their – they have the authority to do that. And I don't think they saw the record very much differently. I think they saw that what that – the result was, was different. But if you – I mean, if you go through – I could go through, like, the findings, and you can see, you know, the ALJ's – the assistant director's findings, they correlate. You can look at number 11, the ALJ's decision, page 9, it's all Lockett's testimony, the driver's testimony. 12 correlates to page 11 – page 18, ALJ 11. Finding the level of functioning in 13, that correlates. It's – they're the same – there's no – there's nothing off the record here. And this is not something that's unusual that agencies do. And it's the legislative mandate to the agency to – you know, there's this process. And it starts with, we had a report of an incident. And then you go through the evaluation – the investigation of this incident in which, you know, this elderly woman was severely injured and died the next day. And that's serious business. It's a thoughtful process. And the facility gets its chance to give its response. And, you know, it goes through several levels. Now it's to the adjudication period. So you've got the ALJ who takes in all of that information and says, here's my findings. Then that goes up to the final decision maker. And I don't – I mean, that's not – that's not unusual. I mean, that's how administrative agencies generally are structured. And you couldn't – I don't know how you'd have it any other way, you know, to have the final decision maker be the assistant director. What, be sitting and doing, you know, the adjudication themselves? That can't – you know, that's not what the General Assembly has provided for administrative agencies. And so for the assistant director to then not be able to say, you know, I don't agree, really then what's the point of review by the assistant director? You know, they have that authority and they have that duty to make that final – make that final call. That's where the responsibility lies. And I think, you know, this was a thorough job in this case. And agree with it or disagree with it, unless the facts are against the manifest weight of the evidence. There's no evidence in the record that supports it unless it's clearly erroneous that you wouldn't come to this, you know, decision. On review it should be – it should be affirmed. And, you know, I think this case, you know, I mean, it's – nobody's happy when these things happen. I mean, that's, you know, obviously. But they do. And the violation doesn't – I mean, it's – the violation doesn't – the occurrence of the incident doesn't create the violation. We already had this particular. Counsel, your time is up. Thank you very much. Thank you, counsel. Mr. Lundy, any further – any rebuttal, sir? Okay. Counsel, I think I made it pretty clear I'm somewhat sympathetic to your plight here. But how about it? Manifest weight of the evidence. What's your response to that? That's the court's duty to follow the standard. Absolutely. Although, your honor, I think the issues here are mixed questions of fact and law. As counsel stated, the assistant director looked at the record and came to different conclusions. She looked at the facts and applied them to law differently. We're talking here about the situation and whether it meets the definition of neglect. And whether the act and code require the facility to have a policy specific to seat belt abuse. With that application of facts to the law, it's under the clearly erroneous standard. Saying that the court cannot re-weigh evidence is true when you're looking at things under the manifest weight of the evidence. But under clearly erroneous, you should reverse if the court has a definite and firm conviction that a mistake has been made. One point of clarification on the penalties. It's a statutory maximum. Type A is the highest level. At that time, $10,000 was the statutory maximum for the violation. The administrative law judge's recommendation was no violation of neglect. A type B violation of section 300.620A, the policy provision, and no fine. What's the more severe monetary fine or the conditional license? What's the more severe penalty? A conditional license raises the possibility that a subsequent violation could lead to license revocation. A type B at this time was a situation that the definition was noncompliance. Does this court have any authority to simply look at the penalties themselves and assess if they were too heavy, too harsh? Yes, Judge, because there is standards within the IEPH regulations for what the penalties should be according to findings. I believe it's section 300.286, give or take a couple sections there. But it lays out factors for the department to consider in setting the level of violation and the fine. I think any review in court can weigh those factors against the evidence as well. To build on the argument here, I think one of the flaws with IEPH's case is an incorrect viewing of neglect under the Nursing Home Care Act and common law court negligence. Everything they talk about, the common sense and we should know and it's best practice to have seatbelts, goes to the idea that perhaps the facility was negligent in not following a duty under the law. But neglect under the Nursing Home Care Act is the failure to provide necessary care and services and maintenance. It's a different thing than common law neglect. Building on that, one of the things the department keeps coming back to is the vulnerability of the residents. Well, you know, certainly R1 needed care. She had been under Belfontine's care for 20 years. The fact that we're appealing doesn't say we're callous in our situation, but the vulnerability of the resident seems to say that it's a strict liability situation where if anything happens that's a negative outcome to the resident, the facility is at fault. That's certainly different than the statutory definition of neglect. Thank you, Your Honors. Thank you, Counsel.